1  Dan Stormer, Esq. [S.B. # 101967]
   Shaleen Shanbhag, Esq. [S.B. #301047]
2  David Clay Washington, Esq. [S.B. #305996]
   HADSELL STORMER RENICK & DAI LLP
3  128 N. Fair Oaks Avenue
   Pasadena, California 91103
4  Telephone: (626) 585-9600
   Facsimile:  (626) 577-7079
5  Emails: dstormer@hadsellstormer.com
           sshanbhag@hadsellstormer.com
6          dwashington@hadsellstormer.com

7  Attorneys for Plaintiff
   CHRISTIAN PINEDA

8

**FILED**
**CLERK, U.S. DISTRICT COURT**

**JUNE 28, 2022**

**CENTRAL DISTRICT OF CALIFORNIA**
**BY: _____ YS _____ DEPUTY**

9          **UNITED STATES DISTRICT COURT**
           **CENTRAL DISTRICT OF CALIFORNIA**
10

11  CHRISTIAN PINEDA,                     Case No.: 2:21-cv-06470-CBM-ASx
                                          [Assigned to the Honorable Consuelo B.
12              Plaintiff,                Marshall – Courtroom 8B]

13       v.                              **FIRST AMENDED COMPLAINT FOR**
                                         **DAMAGES AND DECLARATORY**
14  CITY OF LOS ANGELES; CHIEF          **RELIEF:**
    MICHEL MOORE; COLTON HANEY
15  and STEPHEN MCCLEAN,                 1.   Excessive Force (42 U.S.C. § 1983
                                              4th and 14th Amendments)
16              Defendants.
                                         2.   Failure to Intervene (42 U.S.C.
17                                            § 1983 4th and 14th
                                              Amendments)
18
                                         3.   Freedom of Speech and Association
19                                            (42 U.S.C. § 1983 1st and 14th
                                              Amendments)
20
                                         4.   Municipal Liability—
21                                            Unconstitutional Policy, Practice, or
                                              Custom (42 U.S.C. § 1983)
22
                                         5.   Municipal Liability—
23                                            Ratification (42 U.S.C. § 1983)

24                                       6.   Municipal Liability—Failure to
                                              Train, Supervise, Discipline, or
25                                            Correct (42 U.S.C. § 1983)

26                                       7.    Declaratory Relief
                                              (28 U.S.C. § 2201)
27
                                         **DEMAND FOR JURY TRIAL**
28

_____
FIRST AMENDED COMPLAINT FOR
DAMAGES & DECLARATORY RELIEF

# I.   INTRODUCTION

1.      This case is a horrific example of the unjustified police abuse and First Amendment retaliation meted out violently against peaceful protestors. It arises out of the 2020 national protests sparked by the May 2020 police killing of George Floyd. In May and June 2020, over 25 million people across the nation gathered to demand police accountability and protest police brutality and racism. These protests were the largest demonstrations in American history.

2.      On May 29, 2020, 30-year-old Los Angeles native Christian Pineda attended one such a protest in Downtown Los Angeles.  He protested peacefully, violating no laws. As he marched, he chanted "Hands up! Don't shoot!"

3.      Mr. Pineda arrived downtown at around 5:00 p.m., where he and a few hundred others marched peacefully for three-and-a-half hours in support of police reform and justice for George Floyd.

4.      At around 8:30 p.m., when Mr. Pineda peacefully marching alongside a small group of protesters between Seventh and Eighth Streets on South Grand Avenue, dozens of Los Angeles Police Department officers outfitted in riot gear descended upon him, rapidly forming a skirmish line.  Dozens more officers formed a phalanx behind the skirmish line, with a second phalanx joining nearby.  Without warning, the officers on the skirmish line began beating protesters from behind with their batons.  On information and belief, the skirmish line and its rear phalanx outnumbered the small group of protesters in the area. The officers stopped advancing and held their position, and the protesters continued to walk away.  Nevertheless, and without warning, several officers fired so-called "less lethal" projectiles at the group.

5.      Mr. Pineda was walking backward with his empty hands in the air, away from the officers when Defendant Haney fired a 12-gauge Remington Model 870 shotgun and shot him in the abdomen with a 56-gram ballistic "super-sock" round filled with #9 lead shot (i.e., birdshot).  Without provocation, announcement or warning, Los Angeles Police Department officers targeted and attacked Mr. Pineda because, though

walking away backward, he chanted "Hands up! Don't shoot!" while facing them, and with his open-palmed, empty hands in the air. Seconds before Defendant Haney shot Mr. Pineda, Mr. Pineda yelled, "What is this? A fucking communist country? We have the right to protest!"

6.      Upon being shot, Mr. Pineda buckled over in pain and hobbled away from the officers as fast as he could, only to collapse on the ground, screaming and writhing in pain.  As a result of the severe injury he sustained, Mr. Pineda remained at home in bed for the better part of a week and now has a permanent scar the size of a billiard ball.

7.      The Los Angeles Police Department did not declare the downtown protest an unlawful assembly prior to the shooting.  The declaration was not issued until around 9:30 p.m., 45 minutes after Mr. Pineda had fled the protest after being shot.

## II.      JURISDICTION AND VENUE

8.      This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because Plaintiff asserts claims arising under the laws of the United States including 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments of the United States Constitution.

9.      Venue is proper in this Court because all incidents, events, and occurrences giving rise to this action occurred in the County of Los Angeles, California.

## III.      PARTIES

10.      Plaintiff Christian Pineda is a 30-year-old man who resides in Los Angeles, California.  Mr. Pineda was attacked and shot by Defendants and/or their agents with a 40mm impact projectile, subjecting him to injuries and damages as described herein. Mr. Pineda sues Defendants for the violation of his rights under federal laws.

11.      Defendant City of Los Angeles ("the City") is a duly organized public entity existing under the laws of the State of California. The Los Angeles Police Department ("LAPD") is the law enforcement agency for Defendant City. The City is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including LAPD and its agents and employees. At all

relevant times, Defendant City was responsible for ensuring that the actions, omissions, policies, procedures, practices, and customs of the City and its agencies, employees, and agents complied with the laws of the United States and the State of California.

12.     Defendant Michel Moore is the duly appointed Chief of Police for the LAPD, and an employee of the City. Defendant Moore holds the highest position in the LAPD and is/was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all LAPD employees and/or agents. At all relevant times herein, Defendant Moore was responsible for the promulgation of the policies and procedures and allowances of the practices/customs pursuant to which the acts of the Defendants Haney and McClean alleged herein were committed. Defendant Moore is being sued in both his individual and official capacities for the purpose of ensuring Plaintiff may obtain complete and effective relief as against LAPD, whose actions and conduct are under the control of the current Chief of Police.

13.     Defendant Colton Haney is a police officer with the Los Angeles Police Department who was assigned to a Mobile Field Force on May 29, 2020. Defendant Haney had never responded to a protest before May 29, 2020. Defendant Haney targeted and shot Mr. Pineda with a dangerous projectile from a shotgun without provocation or warning.

14.     Defendant Stephen McClean is a Sergeant with the Los Angeles Police Department. Defendant McClean was the squad leader of the Mobile Field Force to which Defendant Haney was assigned on May 29, 2020. Defendant McLean is directly responsible for Defendant Haney's actions because he was aware of Defendant Haney's inexperience and desire to fire his weapon without regard for the rights and safety of the protesters, yet assigned him a "super sock" shotgun, promised him "trigger time," and encouraged the "contagious fire" that led to Defendant Haney shooting Plaintiff during a chaotic barrage of projectiles fired at the crowd.

15.     At all relevant times, the City was the employer of Defendants Haney and McClean. At the time of the incident, these Defendants were acting under color of law

within the course and scope of their duties as Officers for the LAPD. They were acting with the complete authority and ratification of their principal, Defendant City.

16.     Defendant McClean at all relevant times was a managerial, supervisorial, training, and/or policymaking employee of Defendant City. At the time of the incident, Defendant McLean was acting under color of law within the course and scope of his duties as an employee for the LAPD and/or the City. He had supervisorial authority over Defendant Haney and the Officers and employees of the LAPD. Defendant McLean was acting with the complete authority and ratification of his principal, Defendant City.

17.     Defendants Haney and McLean are sued in both their individual and official capacities.

18.     On information and belief, Defendants Haney and McClean were and still are residents of the County of Los Angeles, California.

19.     In doing the acts and failing to act as hereinafter described, Defendants were acting on the implied and actual permission and consent of the City.

20.     Plaintiff is informed and believes and thereon alleges that at all times relevant herein, Defendants were the agents, employees, servants, joint venturers, partners, and/or co-conspirators of the other Defendants named in this Complaint and that at all times, each of the Defendants was acting within the course and scope of said relationship with Defendants.

21.     All of the acts and omissions complained of herein by Plaintiff against Defendants were done and performed by said Defendants by and through their authorized agents, servants and/or employees, all of whom at all relevant times herein were acting within the course, purpose, and scope of said agency, service, and/or employment capacity. Moreover, Defendants and their agents ratified all of the acts and omissions complained of herein. Whenever and wherever reference is made in this Complaint for Damages to any act or failure to act by a Defendant or Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and severally.

1

2

**IV.    FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

**Nationwide Protests in Response to the Police Killing of George Floyd**

3

4

5

6

7

8

22.    The May 25, 2020 murder of George Floyd by Minneapolis police officers, which occurred not long after the unjustified killings of Breonna Taylor and Ahmaud Arbery, sparked a series of protests across the nation demanding justice and calling for police accountability and reform.  Protests began in the Los Angeles area on May 27, 2020 and continued for weeks.  These nationwide protests were the largest in the history of the country, eclipsing in size even the protests of the Civil Rights Movement.

9

10

11

12

23.    On the morning of May 29, President Trump posted a Tweet calling protesters "thugs" and said, "When the looting starts, the shooting starts."[1]  Hours later, after millions of Americans had read his words, Twitter restricted the Tweet for "glorifying violence."[2]

13

14

15

16

17

18

19

24.    President Trump was directly quoting Miami Chief of Police Walter Headley, who told reporters on December 26, 1967, of protesters during the Civil Rights Movement, "of our Negro population … 10 per cent are violent hoodlums" and warned, "when the looting starts, the shooting starts."[3]  Chief Headley also told reporters, "We don't mind being accused of police brutality. They haven't seen anything yet."  These words were reported in a Hazleton Standard-Speaker article entitled *Words Fail; Miami Cops Get Tough with Negro Thugs*.

20

21

22

23

25.    Defendants took President Trump's dog whistles to heart and engaged in a campaign of targeted violence toward peaceful protesters throughout Los Angeles during the historic 2020 protests in Los Angeles.  Defendants' indiscriminate and horrific violence has resulted in a slew of lawsuits.

24

/ / /

25

26

27

28

[1] https://www.nytimes.com/article/george-floyd-protests-timeline.html

[2] https://time.com/5844530/trump-tweet-minneapolis-violence/

[3] https://www.newspapers.com/image/?clipping_id=52372056 (*Words Fail; Miami Cops Get Tough With Negro Thugs*, HAZLETON STANDARD-SPEAKER, December 27, 1967, front page).

1

## Mr. Pineda Attends the May 29, 2020 Downtown Protest

2      26.    At around 4:00 p.m. on May 29, organizers and protesters arrived at City

3  Hall on the third day of protests in Los Angeles.  There was no curfew in effect in Los

4  Angeles on that day.  During the evening, protesters marched across downtown Los

5  Angeles in support of police reform and justice for George Floyd.

6      27.    Even though the prior two days of "[p]rotests in Los Angeles ha[d] been

7  largely peaceful," Defendant Chief Moore nevertheless placed LAPD on "tactical alert"

8  at 2:20 p.m. (before the May 29 protests began), which "requires all on-duty personnel

9  to remain on duty."[4]  According to LAPD spokesperson Tony Im, this meant that many

10 police officers were forced to work double shifts.[5]

11     28.    Though there were a few ephemeral confrontations between protesters and

12 police in the early evening, LAPD's own After Action Report admits that none of these

13 confrontations occurred on Grand Avenue between Seventh and Eighth Streets, where

14 Mr. Pineda was shot.  Indeed, LAPD did not even declare an unlawful assembly until

15 9:30 p.m., nearly an hour *after* Mr. Pineda was shot and approximately 45 minutes after

16 he went home.

17     29.    Mr. Pineda and a friend arrived downtown shortly before 5:00 p.m., parking

18 near the LAPD Headquarters.  They walked directly to Pershing Square, arriving at

19 approximately 5:00 p.m.  Mr. Pineda attended the protest to publicly denounce George

20 Floyd's killing and to protest police violence and racism.  This was Mr. Pineda's first

21 protest in over ten years. He had last protested for immigrants' rights when he was in

22 high school.

23     30.    Upon his arrival at Pershing Square, Mr. Pineda observed a large number of

24 armed LAPD officers wearing riot gear and monitoring the peaceful crowd.

25     31.    Mr. Pineda protested peacefully at Pershing Square for approximately 20-

26

27 [4] https://kfiam640.iheart.com/content/2020-05-29-protests-against-police-brutality-

28 continue-for-third-night-in-downtown-la/

[5] *Id.*

30 minutes, chanting "Justice for Breonna Taylor," "Justice for George Floyd," and "Hands up! Don't shoot!"  Upon noticing an increase in the police presence and tensions rising at Pershing Square, Mr. Pineda decided to head to the Staples Center and continue to protest in that area.

32.     During the half-hour march from Pershing Square to the Staples Center, Mr. Pineda peacefully chanted and did not observe any violent or unlawful conduct.  The crowd included people of all ages and races making their voices heard and exercising their First Amendment rights.

33.     After protesting for an hour in front of the Staples Center, Mr. Pineda and his friend decided to walk two blocks to other side of the J.W. Marriott and continue his protest there.  He and the protesters around him remained peaceful.

34.     After a short period of time in front of the J.W. Marriott, Mr. Pineda walked among a small group to the intersection of Seventh Street and Grand Avenue, where he continued to protest peacefully.

### Meanwhile, 77th Division's Gang Enforcement Unit Prepared for War

35.     At about 7:00 p.m., 77th Division's Gang Enforcement Unit, operating as a Mobile Field Force Unit on May 29, 2020, included Defendant Haney and was commanded by Defendant McClean. The unit arrived in downtown Los Angeles, first setting up at the intersection of 8th and Broadway. Though no protesters were present at their location, 77th Gang Enforcement immediately requested authorization from the Incident Commander, Deputy Chief Vito Palazzolo, to fire 37mm projectile launchers at protesters. Chief Palazzolo did not ask for the unit's location, the conditions on the ground, or indeed any justification whatsoever, and 77th Gang Enforcement offered no information beyond the request. Deputy Chief Palazzolo simply rubber stamped their request. 77th Gang Enforcement would go on to fire dozens of 37mm rounds at protesters throughout the evening.

36.     77th Gang Enforcement proceeded to Olympic Boulevard and Francisco Street, next to LA Live, where a small group of peaceful protesters had gathered. As one

of the protesters rode his bike in circles while chanting "George Floyd," Defendant Haney thrust his baton forward in repetitive jabbing motions and mused to a fellow officer, "You ever seen a baton go through the spokes of a bike?"

37.    Shortly thereafter, 77th Gang Enforcement drove to Georgia Street at James M. Wood Boulevard, where they directed traffic near the intersection and periodically pointed "less lethal" projectile launchers at a small group of peaceful protesters to their east. Without warning or justification, the unit began to push the crowd eastbound on James M. Wood, demanding that they leave the area. During the Unit's advance, Officer Haney lunged toward a young man seated on the ground, yanked him up with his hands behind his back, and shoved the young man into the crowd.

38.    Shortly thereafter, the small crowd dispersed. Sharing in Haney's obvious excitement, another officer said to him, "Just waiting for one rock or one bottle." The Gang Enforcement Unit proceeded eastbound to the intersection of Cottage Place and James M. Wood Boulevard, where they stood around for ten minutes before loading up and heading to 7th and Olive. Once there, 77th Gang Enforcement formed a column of twos behind several other LAPD units positioned between Olive and Grand on 7th.

39.    Once 77th Gang Enforcement arrived, Sergeant McClean and his second in command, Sergeant Gilberto Gaxiola, ordered Officers Gregory Sovick and Charles Kumlander, the two officers assigned 37mm projectile launchers, to advance forward and provide support to another unit that was advancing in a skirmish line. Though Defendant Haney joined Officers Sovick and Kumlander, running up to the skirmish line and firing two "super sock" rounds at a man who was standing in front of the skirmish line. He ran back to his unit and re-joined the formation. Seconds later, Sergeant McClean approached Defendant Haney, admonished him against leaving the formation without an order, and promised him, "You're gonna get some trigger time." Sergeant Gaxiola chimed in, saying "I know you wanna play."

/ / /

/ / /

**A Throng of LAPD Officers in Riot Gear Violently Attacks the Small Group of Peaceful Protesters on Seventh and Grand**

40.     At approximately 8:25 p.m., Mr. Pineda observed more than 50 police officers in riot gear descend upon Seventh Avenue. At this time, approximately 50 protesters, including people of all races and ages (including an elderly gentleman on roller blades and several individuals wearing MEDIA-emblazoned vests), were chanting the names of innocent African Americans killed by police. More police officers still formed columns behind them. As described above, Defendant McClean's squad, 77th Gang Enforcement Unit, which included Defendant Haney, was among them.

41.     Some of the other LAPD officers formed a skirmish line crossing Seventh Street east of Grand Avenue, with several phalanxes of officers huddled behind them and another huddled at the northeast corner of the intersection.  Several officers in the skirmish line pointed high-powered, large projectile launchers at the protesters.

42.     Moments later, the skirmish line moved westbound (toward the protestors at the intersection of Seventh Street and Grand Avenue) and LAPD officers shouting "move back" began hitting protesters with their batons for no apparent reason.  Several of the officers continued pointing their "less lethal" weapons at the peaceful protesters.

43.     One officer used his baton to hit a visibly unarmed middle aged Black gentleman wearing a blue polo shirt and black-rimmed glasses while the officer to his right aimed his "less lethal" 40mm kinetic projectile launcher at the man.  After being struck with the baton, the gentleman asked the officers, "Why are you killing people, man?"

44.     Within minutes, the LAPD skirmish line formed a stationary north-south line crossing the entirety of Seventh Street on the east side of the intersection with Grand Avenue with several phalanxes of officers, including 77th Gang Enforcement, remaining huddled behind it to the east, and another to the immediate north.  The officers continued to point projectile launchers at the protesters. Defendant Haney exclaimed, "We got 'em pinched dude this is perfect!"

45.     Seconds later, the rear phalanxes of officers, including 77th Gang Enforcement, rushed through the skirmish line and formed an east-west line crossing the entirety of Grand Avenue on the south side of the intersection with Seventh Street. The officers apparently intended to push the small group of protestors south on Grand Avenue. The protestors remained peaceful and began chanting "No justice! No peace!"

46.     Moments later, the north-south skirmish line rushed in a southwesterly direction into the intersection of Seventh Street and Grand Avenue, moving behind the east-west skirmish line and forming a large, unified phalanx with the phalanx that was previously located at the northeast corner of the intersection.

47.     By this point, the small group of protesters had mostly stopped chanting. Instead, most of the protesters ambled about lackadaisically, filming the massive police presence with their phones.  Others walked off, further reducing the already-small size of the group.

48.     Moments after one protester began yelling "No justice! No peace!" the skirmish line began advancing southward along Grand Avenue, again striking protesters with their batons, completely unprovoked.  Due to the rapidly changing positions of the police, Mr. Pineda found himself on Grand Avenue, directly south of (and uncomfortably close to) the advancing skirmish line. As the skirmish line continued to advance on him and the other protestors, Mr. Pineda walked backward and kept a distance of at least 5-10 feet between himself and the officers. He could see the officers pointing their projectile launchers at the protesters. Referring to Lieutenant Robert Humphries and Lieutenant Newlin Driller, Defendant McClean complained, "There's two lieutenants here and they can't fucking make a decision."

49.     Several protesters in front of Mr. Pineda began yelling: "A badge does not mean morality."  The skirmish line immediately picked up its pace and without justification, Defendant McClean yelled "use the stick!"  The officers in the skirmish line proceeded to shove and beat more protesters, with Officer Michael Barragan lunging forward in an attempt to strike Mr. Pineda and a woman next to him with the

officer's baton, and another two officers striking, once again, the gentleman in the blue polo shirt.

50.     During this advance, in addition to ordering the officers to "use the stick," Defendant McClean yelled "37s up!" and "37s ready!" with the latter being a command to fire the 37mm launchers at the unsuspecting crowd. The officers did not fire, and the skirmish line stopped advancing. One officer approached Defendant McClean to ask if he wanted them to shoot. Defendant McClean responded, "Yeah I wanted you to do it but the cameraman got in the way. They stopped the line. Now it's too late."

51.     At this point, the veritable battalion of police officers stood just south of Le Grand Restaurant and Wine Market on Grand Avenue.  Several officers continued to point projectile launchers at the protesters.  The few protesters that remained moved back further away from the officers, creating at least 15 feet of distance between themselves and the officers.  The protesters began chanting again, "No justice! No peace!" and "Hands up! Don't shoot!"  Mr. Pineda chanted the latter phrase with his empty hands raised above his head. Defendant Haney pulled out his shotgun, cocked it, and aimed it at the crowd.

**Without Warning, LAPD Officers Begin Firing Dangerous Kinetic Impact Projectiles and Shoot Mr. Pineda in the Abdomen**

52.     Standing behind the skirmish line, Defendant McClean shouted "37s up!" Suddenly and without provocation or warning, the officers, who had been intermittently pointing their projectile launchers at the protesters, began indiscriminately firing 37mm, 40mm, and "super sock" projectiles into the group.  By this point, not a single protester was within 20 feet of the stationary skirmish line, let alone attempting to cross it.

53.     Defendant Haney aimed at Mr. Pineda and fired a #9 birdshot ballistic "super sock" from his Remington 870 shotgun, which struck Mr. Pineda in the abdomen, while other officers, including Officer Michael Barragan, provided tactical support and fired at other protesters.  Over the course of 30 seconds, the officers, still numbering over 50, fired at least ten dangerous projectiles at what was now a group of

approximately 20 peaceful protesters. Defendant Haney failed to report at least three firings of "super sock" birdshot rounds to his supervisor (Sergeant McClean), including his shooting of Mr. Pineda, despite the ostensible policy requiring that LAPD officers do so. When asked if he would file an amended Form 214 (the form used to report such firings) upon learning of the shooting, Sergeant McClean said, "No."

54. When Defendant Haney fired his weapon at Mr. Pineda, Mr. Pineda had his empty, open-palmed hands raised above his head, was at least 25 feet away from the nearest officer, and was walking backwards. When the projectile struck him, Mr. Pineda buckled over from the pain, turned around and staggered away as fast as he could despite the blinding pain, fearful that another shot might hit him and kill him.

55. Mr. Pineda somehow made his way back to the friend who had accompanied him to the protest. Upon seeing his friend, he exclaimed "I've been shot! I've been shot!" and collapsed on the ground, writhing in pain. The friend, fearful that the police would advance again and harm Mr. Pineda, pleaded "Get up bro!" Mr. Pineda responded, still writhing in agony on the ground, "Nah, let them take me." Others approached and tried to help Mr. Pineda by giving him water and attempting to get him up off the ground before the police advanced again.

56. They succeeded in getting Mr. Pineda up off the ground. He continued screaming in agony, and yelled, "You fucking shot me! Unarmed!" He lifted his shirt to show his approximately four inch inflamed, ruptured and bleeding wound as he yelled in pain and indignation. Media photographers approached to take pictures of his wound.

57. As the photographers were taking pictures, the skirmish line started to advance again while pointing their projectile launchers at the protesters. Upon seeing the advancing officers, Mr. Pineda immediately walked backward, away from the officers. They observed the officers once again beat other peaceful protesters who were also walking away.

58. Moments later, the officers again lifted their weapons and began firing projectiles at the few remaining protesters, again without any warning or announcement.

Mr. Pineda hobbled southward as fast as he could. With a rapidly growing wound on his abdomen, Mr. Pineda continuing to yell out and grimace in pain.

59.    Upon reaching the first point of egress from the block, which was the intersection of Eighth Street and Grand Avenue, Mr. Pineda and his friend fled eastward on Eighth Street. Thusly they began the excruciating 1.25 mile walk back to the car. Mr. Pineda's friend had to provide his shoulder to Mr. Pineda as a crutch, because Mr. Pineda was unable to ambulate unassisted due to the pain emanating from his swelling and broken wound.

60.    At every moment that the squadron of officers decided to advance toward him, Mr. Pineda complied with what appeared to be the officers' intention: to move the protesters southward along Grand Avenue (though this was never announced by the officers). At no point did Mr. Pineda attempt to approach or cross the skirmish line, rather, he moved away from it, even when the skirmish line was stationary.

61.    At every moment of the encounter, it was obvious to the officers and everyone observing that Mr. Pineda was not a threat, was unarmed, empty-handed, and fully compliant. Indeed, at the moment Mr. Pineda was shot, his open hands were in the air, and he was walking backward, away from the skirmish line.

62.    Local news station CBS2 captured the moment Mr. Pineda was shot, clearly showing that he was not a threat, had his hands up in the air, and was walking backward.

/ / /

/ / /

/ / /

[Defendant Haney fires at Mr. Pineda, who is walking backward with his hands up]



[Mr. Pineda buckles over in agony from the projectile strike]



63.     Defendants Haney and McClean never spoke a single word to Mr. Pineda or gave any kind of warning to Mr. Pineda or others before shooting him, nor did any other Officer.  Moreover, when Defendants began firing their weapons at the protesters, they were not even advancing, rather, the skirmish line and phalanx were stationary, at least 20 feet from the closest protester.

64.     At the time the Officer Defendants attacked Mr. Pineda, he was not

resisting arrest and posted no immediate threat of violence or physical harm to the officers or others present.

65.     At no point before being shot did Mr. Pineda hear LAPD officers declare an unlawful assembly or give a dispersal order.

### LAPD's Remington 870 #9 Lead Birdshot Ballistic Rounds

66.     The Remington 870 shotgun with #9 Lead Birdshot encased in a "ballistic fiber sock is identical to the lethal service shotgun used by LAPD officers in the field, save for the munition loaded into the chamber. The LAPD refers to this weapon as a "12-Gauge Super Sock Shotgun." It is a so-called pain compliance tool that can result in serious bodily injury or death.

67.     The 12-Gauge Super Sock Shotgun is a standard-issue Remington pump-action shotgun with fixed barrel sights and a rifled barrel. It has a magazine capacity of four rounds.

68.     LAPD officers fire Combined Tactical Systems, Inc. "Super Sock" #2588 ammunition from their 12-Gauge "Super Sock" Shotguns. The "Super Sock" rounds are high-speed projectiles with a ballistic fiber "sock" filled with #9 lead birdshot.  Each round is 2.4 inches long.



69.     Combined Tactical Systems, Inc., the "Super Sock" manufacturer, describes

1  the ammunition as a "point control impact munition" round that "may cause damage to

2  property, serious bodily injury or death."

3       70.    The Ninth Circuit decried police departments' tendency to refer to these

4  rounds as "beanbag" rounds, stating in *Deorle v. Rutherford*, <u>272 F.3d 1272</u> (9th Cir.

5  2001), "That euphemism grossly underrates the dangerousness of this projectile. The

6  round is not some sort of 'hackey-sack.' It is a projectile capable of inflicting serious

7  injury or death, rather than some children's toy." In that case, the "super sock" round

8  obliterated a man's eye and left lead birdshot implanted in his skull.

9       71.    As "super sock" rounds gained popularity in the early 2000s, doctors began

10 observing their devastating effects. In 2001, *The Annals of Emergency Medicine*

11 published a report studying their use by the LAPD and warning doctors of a variety of

12 injuries—including pierced flesh, penetrated skulls and abdomens ruptured spleens,

13 heart contusions, shattered testicles, and death. Similar contemporaneous reports warned

14 of punctured lungs and epidural hematoma. Despite this, the LAPD's own Tactical

15 Directive relating to the "super sock" shotgun refers to these dangerous rounds as "non-

16 penetrating."

17      72.    Despite the devastating and deadly potential of these heavy rounds filled

18 with lead birdshot fired from a Remington 870 shotgun, the LAPD does not require re-

19 certification in their use. Rather, the LAPD trains officers how to use the Remington 870

20 shotgun with lethal and less lethal rounds during the academy.

21      73.    As a "target-specific weapon," the requirements for use of the Remington

22 870 "Super Sock" shotgun are identical to those of the LAPD's 40mm kinetic impact

23 projectile launcher.

24 <u>**Mr. Pineda Endures Months of Excruciating Pain and, Eventually, a Nerve-Dead**</u>

25 <u>**Imperishable Scar**</u>

26      74.    Mr. Pineda suffered from such excruciating pain from the lead birdshot

27 super sock wound that he could not sleep for two nights, and he remained at home in bed

28 for the better part of a week. During this time, Mr. Pineda felt a constant fiery burning

sensation emanating from his wound, as though he was continuously being stabbed in his stomach with a piece of hot iron.

/ / /

/ / /

/ / /



The wound, which had grown to 5-6 inches in diameter, remained broken, scabbed, and swollen for two weeks, and the heavy black-and-blue bruising around it remained for a month.

75.     For two months, Mr. Pineda felt like his insides had been rearranged by the projectile, and he suffered from tingling extremities, shortness of breath, and chest pain.

76.     The impact of the projectile left a billiard ball sized, raised scar on Mr. Pineda's abdomen.  He has lost most sensation in the area, and can only describe the area as a piece of numb, lifeless rubber that doesn't feel like it is a part of his body.  The raised scarring and lack of sensation at the wound site results in a feeling that can only be described as a rubbery and dead piece of flesh affixed to his body.

77.     Since the incident, Mr. Pineda has suffered emotional harm, including but not limited to, severe emotional distress, loss of sleep, loss of enjoyment of life, anxiety, fear, and anger.  Due to the incident, Mr. Pineda is now extremely fearful of police officers and, upon seeing them, he often has uncontrollable flashbacks of the attack and experiences the trauma all over again.

78.     Mr. Pineda intends in the future to exercise his constitutional right to freedom of speech and association by engaging in expressive activities in the City of Los Angeles.  Defendants' conduct described herein has created uncertainty with respect to Mr. Pineda's exercise now and in the future of his constitutional rights and has chilled his exercise of these rights.

79.     Though Mr. Pineda attended two peaceful protests in the subsequent weeks, on both occasions he felt extreme fear and re-traumatization upon seeing large units of police, and on both occasions he left the protests when upon seeing such units approach.  Were it not for the fear and uncertainty that resulted from his shooting, Mr. Pineda would have continued to attend protests to peacefully exercise his constitutional right to freedom of speech and association.

80.     Mr. Pineda was unjustifiably punished for exercising his First Amendment rights and peacefully expressing his frustration and sadness over the police killings of

George Floyd and Breonna Taylor.  Instead of protecting citizens, Defendants acted recklessly when they targeted the unarmed Mr. Pineda and shot him with a high-speed projectile without warning or justification.

## VI.     FACTUAL ALLEGATIONS COMMON TO *MONELL* CAUSES OF ACTION

81.     On June 30, 2020, the Los Angeles City Council ("City Council") approved a motion directing the LAPD to prepare an After-Action Report reviewing the LAPD's actions during the May-June 2020 protests. The City Council requested that Gerald Chaleff, the author of LAPD's review of the 2007 May Day protests, lead the review. The LAPD ultimately decided to conduct its own after-action review.

82.     In July 2020, the Los Angeles Board of Police Commissioners asked the National Police Foundation ("NPF") to conduct an after-action review assessment, and analysis of the LAPD's actions during the May-June 2020 protests.  The Los Angeles Police Foundation funded the National Police Foundation's after-action review.

83.     Mr. Chaleff and his review team[6] prepared "An Independent Examination of the Los Angeles Police Department 2020 Protest Response," ("Chaleff's After-Action Report"), which was transmitted to the City Council on March 10, 2021.

84.     LAPD's after-action report, "SAFE LA Civil Unrest 2020 After Action Report," ("LAPD Internal After-Action Report") was released on April 9, 2021.

85.     The National Police Foundation's Report, "A Crisis of Trust: A National Police Foundation Report to the Los Angeles Board of Police Commissioners on the Los Angeles Police Department Response to First Amendment Assemblies and Protests Occurring May 27 – June 7, 2020" ("NPF After-Action Report) was released on April 9, 2021.

### Chaleff After-Action Report

86.     The Chaleff After-Action Report found the LAPD's response to the May-

---

[6] Mr. Chaleff led a review team consisting of other retired LAPD officers and a law enforcement consultant.

June 2020 protests deficient in the following areas: (1) planning, (2) command and control, (3) public order policing, (4) less lethal tools, (5) mass arrests, (6) preparedness and training, and (7) wellness.  The Report lists 67 findings across these six areas.

87. The "Planning Findings" include the following:

    a. "There was a lack of a unified message from City leaders to de-escalate the violence so that peaceful protestors could exercise their First Amendment rights."

    b. "There was a lack of firm executive-level direction to the Department command officers to prepare and plan for potential widespread civil unrest and demonstrations which contributed to the problems cited throughout this report."

88. The "Public Order Policing Findings" include the following:

    a. "There was a lack of training to properly prepare command officers for managing large crowds with the possibility of civil unrest and many command officers stated they did not feel confident in handling these incidents."

89. The "Less Lethal Tools Findings" include the following:

    a. "The deployment of less lethal munitions was not always done at the direction of a supervisor or officer. In some instances, officers were directed to be in front of a skirmish line and left to deploy less lethal tools with no direction or coordination."

    b. The LAPD created "no accounting of less lethal munitions" fired during the George Floyd Protests.

90. The "Preparedness and Training Findings" include the following:

    a. "Annual, hands on training on public order policing for command staff diminished over time resulting in many command staff in 2020 not being prepared for the civil unrest."

    b. "[A]dditional training and mentoring in crowd control tactics and

specific incident command system positions, such as incident commander, operations chief, logistics, etc. are needed and should be conducted on an annual basis."

91.    The Chaleff After-Action Report issued 22 recommendations, which include:

a.    "Undertake an extensive study of all less lethal munitions, including the 40 mm round, to examine performance, consistent velocity, potential for ricochets, influence of the plastic wrapping or banding around the sponge projectile and other aspects of the round. Included in that study should be any potential new technology for use in public order policing operations."

b.    "Design and implement an inventory system to audit and track the amount of less lethal munitions, including the 37mm and 40mm rounds, expended during any public order policing incidents."

c.    "Update the use of force tactical directives to include more detailed instruction regarding the use of less lethal tools in crowds and the approval level required for the deployment of each the less lethal tools."

d.    "Establish protocols that: (a) Only trained (certified) members of Metropolitan Division or officers who receive consistent and periodic instruction and certification in the 40mm system should be allowed to deploy the 40mm during crowd control situations, (b) Retain the use of the 40mm system for all other officers during patrol duties and ensure annual retraining of weapon manipulations during shotgun qualification, and (c) Mandate the use of body worn video (when feasible) to record problem behavior of individuals in the crowd when officers decide to use the target specific 40mm in a crowd control situation."

**NPF After-Action Report**

92. The NPF After-Action Report lists 22 findings, which include:

    a.    LAPD's policies and practices "were inadequate to handle the disparate groups, or to identify leaders amongst the protesters and address the level of violence."

    b.    "Some LAPD personnel had not been provided contemporary training on crowd management, mobile field force, supervision, de-escalation, or the use of less-lethal instruments prior to the First Amendment assemblies and demonstrations from May 27 through June 7, 2020. Many of the LAPD training bulletins, courses, and directives related to crowd management and control were outdated."

    c.    LAPD "do[es] not have one policy directing response specifically to large scale, fluid, city-wide civil unrest that turns violent or contains violence."

    d.    Communication "between the Chief, his command staff, bureau commanders and field supervisors, and line officers" was inconsistent and "created significant challenges regarding: (a) identifying a cogent operating philosophy; (b) determining operations during individual shifts, including when shifts started and ended; and, (c) establishing coordination and consistency between shifts." This "impacted every component of the LAPD response" to the protests.

93. The NPF's recommendations include:

    a.    "LAPD should synthesize the relevant provisions spread throughout the current Department and clearly establish guidelines for the coordination, facilitation, and management of First Amendment assemblies and protests."

    b.    "LAPD should review national and international best practices regarding the impact of police actions on First Amendment assembly

and protest participants."

c.   LAPD should "develop[] strategies, tactics, and Mobile Field Force teams to more effectively respond to these types of First Amendment assemblies and protests, which are becoming more frequent in the City and nationwide."

d.   "LAPD should consider developing an overarching 'response to fluid dynamic protests and civil unrest' policy that provides for the nuances of this type of event, incorporates critical thinking skills and offers decision making models to guide at what points uses of force and relevant tools are permitted to be used by LAPD officers."

**LAPD Internal After-Action Report**

94.   According to the LAPD, officers deployed 11,305 rounds of "less-lethal munitions" during the May-June protests, comprised of:

a.   4,377 37mm projectile rounds

b.   2,621 40mm projectile rounds

c.   4,307 beanbag shotgun rounds

95.   The LAPD's Internal After-Action Report list recommendations in twenty-six areas of improvement. Some of these recommendations highlighted the LAPD's inadequate command and control training and deficiencies regarding communications and unity of command.

96.   One specific recommendation is: "The Department used a significant amount of less-lethal munitions to protect the City and restore order. The Department should continue to research and seek best practices related to the deployment of less-lethal munitions. This should include an examination of the Department's current less-lethal capabilities and new available technologies. A clear understanding regarding when to deploy less-lethal and the level of approval necessary should be reiterated and clarified to avoid confusion. When less-lethal is deployed, when available it should be used in conjunction with BWV to capture the activity leading up to the decision to use

1   less-lethal. Officers trained in less-lethal should attend annual weapons manipulation
2   training."

3   97.    The LAPD Internal After-Action Report does not address the thousands of
4   citizen complaints arising from these protests.

5   98.    Despite all evidence to contrary, Chief Moore stated that the "vast majority
6   of [LAPD] personnel performed admirably" during the protests in his letter to the Police
7   Commission accompanying the LAPD Internal After-Action Report.

8                               **SAFE LA Task Force**

9   99.    The SAFE LA Task Force was established to handle personnel complaints
10  arising out of the May-June 2020 protests.

11  100.   On April 9, 2021, the Board of Police Commissioners received the "SAFE
12  LA Task Force Update Report" from Chief Moore.

13  101.   According to the Report, the Office of the Inspector General received 2,850
14  personnel complaints related to the protests. The SAFE LA Task Force initiated 210
15  complaint investigations, of which 73 were related to excessive use of force.  As of April
16  9, 2021, 33 of these investigations were reviewed and no allegations for unauthorized
17  force were sustained.

18       **LAPD's History of Lawsuits Resulting from Excessive Force at Protests**

19  102.   In the years preceding the May-June 2020 protests, the City has settled the
20  following class action lawsuits alleging that LAPD officers used unreasonable and
21  excessive force against peaceful protestors in violation of their First and Fourth
22  Amendment rights:

23       a.    *National Lawyers Guild, et al. v. City of Los Angeles, et al.*, No. CV
24             01- 6877 FMC(CWx): class action arising out of LAPD's use of
25             unlawful force and disruption of lawful assemblies during the 2000
26             Democratic National Convention.  The $5 million settlement
27             addressed the use of "less-lethal" weapons and chemical munitions to
28             disperse peaceful protestors.

b.   *Multi-Ethnic Worker Organizing Network v. City of Los Angeles*, No. 2:07-cv-03072-AHM(FFM) (C.D. Cal.): class action for LAPD's excessive use of force and related conduct at 2007 May Day protests. The case settled for $12.8 million and resulted in a Structural Relief Order which included that less lethal weapons may not be used on lawfully dispersing or retreating persons or crowds, and when feasible, notice should be given before deploying less lethal weapons in a crowd control incident or for dispersal.  The Order also stated that unlawful assembly orders must use an amplified loudspeaker, and if there is no serious violence occurring, the order shall be made repeatedly over a period of time, including an "objectively reasonable" period of time to disperse and identification of "a clear and safe route" to follow to disperse.

c.   *Aichele v. City of Los Angeles*, No. CV 12-10863-DMG (FFMx) (C.D. Cal.): class action for injunctive relief and damages for arrests and related actions regarding the shutdown of Occupy LA's use of the City Hall lawn in 2011. The $2.45 million settlement included that LAPD officers should not "kettle" protestors attempting to comply with a dispersal order.

d.   *Chua v. City of Los Angeles*, No. 2:16-cv-00237-JAK(GJSx) (C.D. Cal.): class action for LAPD violence during the 2014 Ferguson protests, which settled for $750,000.  The settlement stated that demonstrators shall not be "kettled" after being given a dispersal order.

103.   Chief Moore, as well as members of his command staff, officers to whom he has delegated his responsibility to enact and implement lawful policies on use of force (including the Remington 870 "Super Sock" shotgun), public order policing, dispersal orders, and declaration of an unlawful assembly, are aware of the ongoing

unlawful policies, practices, and customs of the City and the LAPD which resulted in the above settlements.  Despite the above settlements, these unlawful policies, practices, and customs continue under the City and Chief Moore's command.

**FIRST CLAIM FOR RELIEF**

**Excessive Force (4th and 14th Amendments; 42 U.S.C. § 1983)**

**(Plaintiff Against Defendants Haney and McClean)**

104.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

105.   All of the acts of Defendants Haney and McClean and the persons involved were done under color of state law.

106.   The acts of Defendants Haney and McClean deprived Mr. Pineda of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the Fourth Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, subjecting him to unreasonable and excessive force.

107.   Specifically, Defendant McClean ordered Officer Michael Barragan to "use the stick." Moreover, Defendant McClean was aware of Defendant Haney's desire to fire his weapon, engaged in a course of conduct that virtually ensured that Defendant Haney would do so without justification, and indeed ordered the commencement of the contagious fire that resulted in Defendant Haney shooting Plaintiff.  Defendant Haney unreasonably attacked and shot Christian Pineda with a dangerous lead birdshot "Super Sock" round without justification, resulting in grievous bodily injury to Mr. Pineda's person.

108.   Defendant McClean was both personally involved and an integral participant in the violation of Mr. Pineda's constitutional rights because each officer was aware of the actual unlawful actions of Defendant Haney as well as his desire and propensity for same, did not object to these violations of Mr. Pineda's rights, and

participated in the violations by performing police functions, including meaningful participation in the needless and unnecessary operation to escalate the encounter with Mr. Pineda and use unjustified "less lethal" force.

109.  As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Pineda sustained and incurred damages including pain, suffering, and emotional injury.

110.  The conduct of Defendants was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

## SECOND CLAIM FOR RELIEF

### Failure to Intervene (4th and 14th Amendments; 42 U.S.C. § 1983)
### (Plaintiff Against Defendant McClean)

111.  Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

112.  All of the acts of Defendant McClean and the persons involved were done under color of state law.

113.  The acts of Defendant McClean deprived Mr. Pineda of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the Fourth Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, failing to intervene in the unlawful actions of other officers, including hitting Mr. Pineda with a baton, pointing their weapons at Mr. Pineda and shooting him with a dangerous lead birdshot "Super Sock" round without justification.

114.  As a direct and proximate result of the aforementioned acts or omissions of Defendant McClean, Mr. Pineda sustained and incurred damages including pain, suffering, and emotional injury.

115.   The conduct of Defendant McClean was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

**THIRD CLAIM FOR RELIEF**

**Freedom of Speech (1st and 14th Amendments; 42 U.S.C. § 1983)**

**(Plaintiff Against Defendants Haney and McClean)**

116.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

117.   All of the acts of Defendants and the persons involved were done under color of state law.

118.   The acts of these Defendants deprived Mr. Pineda of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the First Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, retaliating against Mr. Pineda for engaging in constitutionally protected activity.

119.   Mr. Pineda engaged in constitutionally protected acts of observing, recording, and participating in an event of public interest, specifically a public demonstration, and in expressing his political views.

120.   Defendants targeted and/or retaliated against Mr. Pineda for engaging in constitutionally protected activity and for the content and viewpoint of his expressions, including, but not limited to, his attendance at the protest and his statements while there.

121.   Defendants' acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Mr. Pineda from continuing to observe, record, and participate in the May 29 protest and to participate in other peaceful protests.

122.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Pineda sustained and incurred damages including pain, suffering, and emotional injury.

123.   The conduct of Defendants was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

## FOURTH CLAIM FOR RELIEF

**Municipal Liability—Unconstitutional Policy, Practice, Custom (42 U.S.C. § 1983)**

**(Plaintiff Against Defendants City, Moore, and McClean)**

124.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

125.   As described above, the acts of Defendants deprived Mr. Pineda of his rights under the United States Constitution.

126.   Defendants acted under the color of law.

127.   The individual Defendants acted pursuant to expressly adopted official policies or longstanding practices or customs of Defendants City, Chief Moore, and McClean.

128.   Based on the aforementioned facts, Defendants City, Chief Moore, and McClean, as policymakers and supervisors maintained the following unconstitutional customs, practices, and policies:

a.   Using excessive force, including excessive "less lethal" force in crowd control situations including but not limited to engaging with peacefully protesting individuals;

b.   Providing inadequate training regarding the use of "less lethal" force in crowd control situations, including during encounters with individuals who are peacefully protesting;

c.   Employing and retaining as Officers and other personnel, including Defendants McClean and Haney, who Defendants City and Chief Moore at all times material herein, knew or reasonably should have known had dangerous propensities for abusing their authority and for mistreating citizens by failing to follow written LAPD policies and for using excessive force;

d.   Inadequately supervising, training, controlling, assigning, and disciplining LAPD officers including Defendants McClean and Haney, who Defendants City and Chief Moore each knew, or in the exercise of reasonable care, should have known had the aforementioned propensities and character traits;

e.   Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, and disciplining and controlling the intentional misconduct by LAPD Officers including Defendants McClean and Haney;

f.   Failing to adequately discipline LAPD Officers, including Defendants McClean and Haney, for the above-referenced categories of misconduct, including "slaps on the wrist," discipline that is so slight as to be out of proportion to the magnitude of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct;

g.   Announcing that unjustified uses of force are "within policy," including uses of force later determined in court to be unconstitutional;

h.   Refusing to discipline, terminate, or retrain the Officers involved, even where uses of force were determined in court to be unconstitutional and where Officers commit repeated constitutional violations;

i.    Encouraging, accommodating, or facilitating a "blue code of silence," "blue shield," "blue wall," "blue curtain," "blue veil," or simple "code of silence," pursuant to which Officers do not report other Officers' errors, misconduct or crimes. Pursuant to this code of silence, if questioned about an incident of misconduct involving another deputy, while following the code, the deputy being questioned will claim ignorance of the other Officers' wrongdoing;

j.    Maintaining a policy of inaction and an attitude of indifference towards soaring numbers of police uses of force, including by failing to discipline, retrain, investigate, terminate, and recommend Officers for criminal prosecution who participate in using excessive force against unarmed people;

k.    Covering up police misconduct and refusing to release information about police misconduct to the public even when required to do so by law. These customs and practices by Defendants City and Chief Moore were condoned by said Defendants in deliberate indifference to the safety and rights of its civilians, including Plaintiff.

l.    Failing to follow or enforce compliance by Officers with the LAPD's own policies.

m.    Failing to follow or enforce compliance by Officers with national law enforcement training and standards.

129.   Defendants City, Chief Moore, and McClean together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the different policies, practices, and customs alleged in the paragraphs above. Despite having knowledge as stated above, these Defendants condoned, tolerated and through actions and inactions ratified such policies. Said Defendants also acted with deliberate indifference to both the foreseeable effects and consequences of these policies and to the constitutional rights of Plaintiff, and other individuals similarly situated.

130.   By perpetuating, sanctioning, tolerating, and ratifying the outrageous conduct and other wrongful acts, Defendants City, Chief Moore, and McClean acted with an intentional, reckless, callous disregard for the well-being of Mr. Pineda and his constitutional as well as human rights. Furthermore, the policies, practices, and customs implemented, maintained, and still tolerated by Defendants City, Chief Moore, and McClean were affirmatively linked to and were a significantly influential and moving force behind the injuries of Mr. Pineda.

131.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Pineda sustained and incurred damages including pain, suffering, and emotional injury.

132.   The conduct of Defendants City, Chief Moore, and McClean was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

## FIFTH CLAIM FOR RELIEF

### Municipal Liability—Ratification (42 U.S.C. § 1983)

### (Plaintiff Against Defendants City, Moore, and McClean)

133.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

134.   As described above, the acts of Defendants McClean and Haney deprived Mr. Pineda of his rights under the United States Constitution.

135.   Upon information and belief, the City, Chief of Police Moore, and McClean as final policymakers, acting under color of law, who had final policymaking authority concerning the acts of Defendants McClean and Haney ratified the individual Defendants' acts and the bases for them. Upon information and belief, the final policymakers knew of and specifically approved of the individual Defendants' acts and found them to be justified and within policy, including by failing to investigate them.

136.   Upon information and belief, the City, Chief of Police Moore, and McClean as final policymakers, acting under color of law, have a history of ratifying unreasonable uses of force, including unreasonable less than lethal force.

137.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Pineda sustained and incurred damages including pain, suffering, and emotional injury.

138.   The conduct of Defendants City, Moore, and McClean was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

## SIXTH CLAIM FOR RELIEF

### Municipal Liability—Failure to Train, Supervise, Discipline, or Correct

### (42 U.S.C. § 1983)

### (Plaintiff Against Defendants City, Moore, and McClean)

139.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

140.   As described above, the acts of Defendants McClean and Haney deprived Mr. Pineda of his rights under the United States Constitution.

141.   Defendants McClean and Haney acted under the color of law.

142.   The individual Defendants acted pursuant to expressly adopted official policies or longstanding practices or customs of Defendants City, Chief Moore, and McClean.

143.   On information and belief, Defendants City, Chief Moore, and McClean, acting under color of law, failed to properly and adequately train Defendants McClean and Haney, including but not limited to, with regard to the use of physical force and less than lethal force.

144.   In addition, the training policies of the City of Los Angeles were not

adequate to train its officers to handle the usual and recurring situations with which they must deal, including but not limited to encounters with individuals who are peacefully exercising their First Amendment rights.  The City of Los Angeles failed to adequately train its officers on public order policing, using "less lethal" weapons, including the 870 Remington Shotgun "super sock" munitions in crowd control situations, and isolating and removing small groups of violent or criminal individuals within a larger group of peaceful protestors, and failed to adequately supervise, direct, and/or coordinate its officers' deployment of the munitions during the protests.

145.   The City of Los Angeles knew that its failure to adequately train its officers on public order policing, using the munitions in crowd control situations, and isolating and removing small groups of violent or criminal individuals within a larger group of peaceful protestors made it highly predictable that its officers would engage in conduct that would deprive persons such as Mr. Pineda of their rights. The City of Los Angeles knew that its failure to adequately supervise, direct, and/or coordinate its officers' deployment of munitions made it highly predictable that its officers would engage in conduct that would deprive persons such as Mr. Pineda of their rights. The City of Los Angeles was thus deliberately indifferent to the obvious consequences of its failure to train its officers adequately.

146.   Properly trained officers are trained to facilitate peaceful protestors' exercise of their First Amendment rights.

147.   Properly trained officers are trained to use less than lethal force only in response to someone violently resisting arrest or who poses an immediate threat of violence or physical harm. Defendants McClean and Haney used such force against Mr. Pineda even though he was not violently resisting arrest and posed no immediate threat of violence or physical harm to the Officers or anyone else.

148.   Defendants City, Chief Moore, and McClean furthermore failed to enforce compliance by LAPD Officers with national law enforcement training and standards.

149.   Defendants City, Chief Moore, and McClean were deliberately indifferent

to the obvious consequences of its failure to train their Officers adequately. They knew that the failure to adequately train their Officers made it highly predictable that their Officers would engage in conduct that would deprive persons of their constitutional rights.

150.   The failure of Defendants' City, Chief Moore, and McClean to provide adequate training regarding, *inter alia*, the use of "less lethal" munitions in crowd control situations, resulted in the wrongful uses of force against Mr. Pineda. The failure of Defendants City and Chief Moore to provide adequate training caused the deprivation of Mr. Pineda's rights by Defendants McClean and Haney,; that is, Defendants' failure to train is so closely related to the deprivation of Mr. Pineda's rights as to the be moving force that caused the ultimate injury.

151.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Pineda sustained and incurred damages including pain, suffering, and emotional injury.

152.   The conduct of Defendants City, Moore, and McClean was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of Mr. Pineda and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

## SEVENTH CLAIM FOR RELIEF

### Declaratory Relief (28 U.S.C § 2201)

### (Plaintiff Against All Defendants)

153.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

154.   There is an actual controversy between Plaintiff and Defendants concerning their respective rights and duties in that Plaintiff contends that the acts of Defendants, as described herein, are in violation of federal law, and Defendants contend in all aspects to the contrary.

155.   Plaintiff is entitled to a legal declaration of his rights and Defendants'
obligations under the applicable laws as alleged in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.   For compensatory, general and special damages against each Defendant,
jointly and severally, amounts to be proven at trial;

2.   For punitive and exemplary damages against individually named
defendants, Defendant Moore and Defendants McClean and Haney in an amount
appropriate to punish Defendant(s) and deter others from engaging in similar
misconduct;

3.   For prejudgment interest;

4.   For costs of suit and reasonable attorneys' fees and costs as authorized by
statute or law;

5.   For restitution as the Court deems just and proper;

6.   For a declaratory judgment that Defendants violated Plaintiff's rights under
the Fourth, Fourteenth, and First Amendments to the United States Constitution; and

7.   For such other relief, including injunctive relief, as the Court may deem
proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues so triable.

Dated: June 24, 2022                    Respectfully Submitted,

                                        HADSELL STORMER RENICK & DAI LLP


                                        By:    /s/ David Clay Washington
                                             Dan Stormer
                                             Shaleen Shanbhag
                                             David Clay Washington
                                        Attorneys for Plaintiff
                                        CHRISTIAN PINEDA